**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
bgreenberg@litedepalma.com

*Attorneys for Plaintiffs and the Class*

[Additional counsel on signature page]

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANNA CONOVER, PARRISH AND JACQUELINE SHERIDAN, BRYAN AND JACQUELINE VAN VELSON, | : **Civil Action No.: 1:17-cv-04625-RMB-JS** |
| *Plaintiffs,* | : |
| v. | : **FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| PATRIOT LAND TRANSFER, LLC, WELLS FARGO BANK, N.A., | : |
| *Defendants.* | : |

Plaintiffs Anna Conover, Parrish and Jacqueline Sheridan, and Bryan and Jacqueline Van Velson on behalf of themselves and on behalf of the entire class of persons similarly situated, by and through their attorneys, Bruce Greenberg of Lite DePalma Greenberg, LLC, Michael Paul Smith of Smith, Gildea & Schmidt, LLC, *pro hac vice,* and Timothy F. Maloney, of Joseph, Greenwald and Laake, P.A., *pro hac vice,* hereby file this First Amended Class Action Complaint and state as follows:

### INTRODUCTION

1.     Plaintiffs and Class Members are victims of an illegal kickback agreement between Defendant Patriot Land Transfer, LLC ("Patriot") and Defendant Wells Fargo Bank,

N.A. ("Wells Fargo").   Patriot paid Wells Fargo's brokers, branch managers, loan officers, agents and other employees kickbacks in exchange for Wells Fargo's assignment and referral of residential mortgage loans, refinances and reverse mortgages to Patriot for title and settlement services ("Patriot Kickback Agreement") in violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq.* ("RESPA").

2.      At this point it is known that Patriot paid Wells Fargo kickbacks in the form of borrower leads data and lists. Patriot purchased the borrower leads data and lists from third party marketing companies and gave the data to Wells Fargo on a per unit basis for each loan referred to and closed by Patriot. In addition and/or in the alternative, Patriot gave the data to Wells Fargo on the agreement and with the understanding that all loans generated by the borrower leads data and lists would be referred to Patriot for title and settlement services.

3.      Wells Fargo's management set up, endorsed and required its home mortgage consultants ("HMCs") to participate in the Patriot Kickback Agreement and facilitated the systematic and continuous violation of federal law for at least two years while Wells Fargo was being investigated by the Consumer Financial Protection Bureau ("CFPB") for its receipt and acceptance of millions of dollars in free marketing materials, including borrower leads data and lists, as kickbacks from another title company, Genuine Title, LLC.

4.      Plaintiffs believe, and therefore aver, that Patriot and Wells Fargo chose borrower leads data and lists as the currency of the kickbacks for the purpose of concealing the kickbacks and Patriot Kickback Agreement from investigators, regulators and borrowers, including Plaintiffs and Class Members.

5.      Patriot paid for the kickbacks it paid Wells Fargo by maximizing the cost charged Wells Fargo borrowers for settlement services, including the charging of special, extra and

2

discretionary fees which artificially inflated borrowers' settlement costs by more than $100 per loan and were not itemized or disclosed to borrowers by Patriot or Wells Fargo, in direct contravention of the purposes and intent of RESPA.

6.      Upon information and belief, Patriot paid kickbacks to other residential mortgage lenders (collectively, "Participating Lenders") under similar kickback agreements for the assignment and referral of loans to Patriot for title and settlement services.  Plaintiffs reserve the right to amend this Complaint to add Participating Lenders.

## PARTIES

7.      Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23 as a class action on their own behalf and on behalf of the entire class of people similarly situated that is defined in ¶103 below.Plaintiff Anna Conover is a citizen and resident of Atlantic County, New Jersey, and lives at 238 Main Avenue, Milmay, New Jersey.

8.      Plaintiffs Parrish and Jacqueline Sheridan are citizens and residents of Monmouth County, New Jersey, and live at 213 Fairway Lane, Neptune, New Jersey.

9.      Plaintiffs Bryan and Jacqueline Van Velson are citizens and residents of Monmouth County, New Jersey, and live at 4 Parkview Drive, Hazlet, New Jersey.

10.      Defendant Patriot Land Transfer, LLC, is a limited liability company licensed to conduct business throughout New Jersey and elsewhere and maintains its principal place of business at 5001 New Jersey 42, Turnersville, New Jersey, 08012. In some places, Defendant Patriot Land Transfer, LLC also does business as "Patriot Land Transfer of NJ, LLC."

11.      Defendant Wells Fargo Bank, N.A., is a member of the national association of banks doing business throughout the United States and existing under California law. Wells

Fargo engaged in the business of residential mortgage lending across the nation, including in New Jersey.

## JURISDICTION AND VENUE

12. This Court has personal jurisdiction over the parties and subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within this District.

## FACTUAL ALLEGATIONS FOR INDIVIDUAL AND CLASS RELIEF

14. At all relevant times Patriot was a title settlement service company licensed and authorized to do business under the laws of various states, including New Jersey.

15. At all relevant times, Wells Fargo's HMCs were licensed mortgage brokers and/or authorized loan officers and acting within the scope of the business relationship and duties of their employment on behalf of Wells Fargo, specifically: seeking borrowers and securing loans for residential mortgages through Wells Fargo and/or brokering loans through Wells Fargo to other lenders authorized by Wells Fargo, the referral of Wells Fargo borrowers and/or their loans to title companies, and working with title companies to close these loans. All activities, including the interactions with Patriot, were for the benefit of Wells Fargo.

16. In 2015, the Consumer Financial Protection Bureau ("CFPB") filed a Complaint against Wells Fargo in the United States District Court for the District of Maryland, alleging that from 2009 through 2013 Wells Fargo HMCs at 18 different branches received and accepted illegal kickbacks from Maryland-based Genuine Tile, LLC in exchange for the assignment and referral of Wells Fargo's loans to Genuine Title for title and settlement services ("Genuine Title

Kickback Scheme"). *See* Complaint, *Consumer Fin. Prot. Bureau v. Wells Fargo Bank, N.A.*, Case No. 1:15-cv-00179-RDB (D. Md., filed Jan. 22, 2015), ECF Dckt. #1.

17.     Genuine Title paid Wells Fargo kickbacks in the form of free marketing materials and services, including: borrower leads data and lists, direct mail pieces, direct mail handling services (e.g., folding and envelope stuffing) and/or postage. The free marketing materials kickbacks Wells Fargo received and accepted from Genuine Title allowed Wells Fargo to profit from continuously attracting and inducing borrowers to purchase Wells Fargo mortgage products while substantially reducing or eliminating the marketing costs to Wells Fargo in doing so and allowed Wells Fargo's HMCs to receive substantial commissions on the resulting loans.

18.     A later-filed borrower class action revealed that Genuine Title also paid cash kickbacks to a portion of Wells Fargo HMCs.

19.     Wells Fargo entered a CFPB Consent Order and paid a $21,000,000 civil penalty related to its participation in the Genuine Title Kickback Scheme. Consent Order, *In re Wells Fargo Bank, N.A.,* Case No. 2015-CFPB-0002 (January 22, 2015) ECF #1; Stipulated Final Judgment and Order with Respect to Wells Fargo Bank, N.A., at p. 5, para. 16, *Consumer Fin. Prot. Bureau v. Wells Fargo Bank, N.A.*, Case No. 1:15-cv-00179-RDB (D. Md. filed Feb. 5, 2015) ECF Dckt. #11.

20.     Wells Fargo discontinued its participation in the Genuine Title Kickback Scheme in 2013 when the Maryland Insurance Administration ("MIA") and CFPB began investigating Genuine Title.

21.     To continue to receive kickbacks, Wells Fargo entered the Patriot Kickback Agreement and substituted Patriot for Genuine Title at certain Wells Fargo branches, and began

receiving and accepting kickbacks from Patriot in exchange for the assignment and referral of Wells Fargo loans to Patriot for title and settlement services.

22.     Under the Patriot Kickback Agreement, Patriot paid, and Wells Fargo's HMCs and other employees received and accepted, kickbacks in the form of borrowers lead data and lists.  As with the Genuine Title Kickback Scheme, the borrower leads data and lists paid by Patriot as kickbacks were designed to allow Wells Fargo to profit from continuously attracting and inducing borrowers to purchase Wells Fargo mortgage products while substantially reducing or eliminating the marketing cost to Wells Fargo in doing so, and for Wells Fargo's HMCs to receive substantial commissions on the resulting loans.

23.     Based on Wells Fargo's pattern of practice in the Genuine Title Kickback Scheme, Plaintiffs believe, and therefore aver, that Patriot paid and Wells Fargo's HMCs received and accepted, kickbacks in the form of things of value other than borrower leads data and lists pursuant to the Patriot Kickback Agreement.

24.     In furtherance of the Patriot Kickback Agreement, Patriot adopted the business practice of charging the maximum amount of title and settlement services, including all possible special and/or extra charges and discretionary fees on the loans assigned and referred to Patriot by Wells Fargo. The special and/or extra charges included $25 for holding the settlement outside of Patriot's offices, $50 for holding the settlement outside of regular business hours, and $30 for overnight delivery services borrowers did not request. The discretionary fees Patriot charged Wells Fargo borrowers included maximum fees charged for handling e-documents, transaction management, wiring fees, and handling of recorded documents.

25.     In furtherance of the Patriot Kickback Agreement, Patriot and Wells Fargo also adopted the business practice of choosing not to provide borrowers with an itemization of special

and/or extra charges and discretionary fees and/or notify borrowers that there were ways to lower the amount charged for certain settlement services or to avoid the special and/or extra charges and discretionary fees.

26.    These business practices resulted in Wells Fargo borrowers, including Plaintiffs and Class Members, paying unnecessarily high and additional costs for title and settlement services and more for settlement services than borrowers would have without the Patriot Kickback Agreement.

27.    Patriot's business practice of charging Wells Fargo borrowers the maximum amount of settlement service charges including special and/or extra charges and discretionary fees was for the additional purpose of forcing borrowers to pay for the cost of the kickbacks Patriot was paying to Wells Fargo under the Patriot Kickback Agreement.

28.    Plaintiffs believe, and therefore aver, that Patriot paid kickbacks instead of competing for borrowers on the basis of price, service, or quality of settlement services because paying kickbacks was an easier and more effective way for Patriot to build market share.

29.    Wells Fargo corporate management was aware of and required its branch managers and HMCs to participate in the Patriot Kickback Agreement and to receive and accept kickbacks from Patriot. Wells Fargo corporate management introduced Wells Fargo branch managers and HMCs to Patriot to facilitate the Patriot Kickback Agreement. The borrower leads data and lists, and, upon information and belief, other things of value, were received and accepted by Wells Fargo's HMCs for the benefit of Wells Fargo.

30.    From January, 2007 through March, 2015, Thomas Crowe was employed as a Wells Fargo HMC at a Wells Fargo branch in Northfield, New Jersey. Crowe was required by Wells Fargo corporate management to participate in the Patriot Kickback Agreement as a

688694.1

condition of his continued employment with Wells Fargo. Crowe in fact assigned and referred loans to Patriot under the Patriot Kickback Agreement and received and accepted kickbacks from Patriot in the form of borrower leads data and lists.

31.     From March, 2009 through March, 2015, Jeffrey Bellak was employed as a Wells Fargo HMC in a Wells Fargo branch in Northfield, New Jersey.  Bellak was required by Wells Fargo corporate management to participate in the Patriot Kickback Agreement as a condition of his continued employment with Wells Fargo. Bellak in fact assigned and referred loans to Patriot under the Patriot Kickback Agreement and received and accepted kickbacks from Patriot in the form of borrower leads data and lists.

32.     From December, 2008 through March, 2015, Marc Cramer was employed as a Wells Fargo HMC in a Wells Fargo branch in Northfield, New Jersey.  Cramer was required by Wells Fargo corporate management to participate in the Patriot Kickback Agreement as a condition of his continued employment with Wells Fargo. Cramer in fact assigned and referred loans to Patriot under the Patriot Kickback Agreement and received and accepted kickbacks from Patriot in the form of borrower leads data and lists.

33.     From May, 2002 through March, 2015, Theresa Cibotti was employed as a Wells Fargo HMC in a Wells Fargo branch in Northfield, New Jersey.  Cibotti was required by Wells Fargo corporate management to participate in the Patriot Kickback Agreement as a condition of her continued employment with Wells Fargo.  Cibotti in fact assigned and referred loans to Patriot under the Patriot Kickback Agreement and received and accepted from kickbacks from Patriot in the form of borrower leads data and lists.

34.     From May, 2014 through March, 2015, John Dally was employed as a Wells Fargo HMC in a Wells Fargo branch in Northfield, New Jersey. Dally was required by Wells

Fargo corporate management to participate in the Patriot Kickback Agreement as a condition of his continued employment with Wells Fargo.  Dally in fact assigned and referred loans to Patriot under the Patriot Kickback Agreement and received and accepted kickbacks from Patriot in the form of borrower leads data and lists.

35.     From March, 2009 through April, 2015, John Fuhrmeister was employed as a Wells Fargo HMC in a Wells Fargo branch in Princeton, New Jersey.  Fuhrmeister was required by Wells Fargo corporate management to participate in the Patriot Kickback Agreement as a condition of his continued employment with Wells Fargo. Fuhrmeister in fact assigned and referred loans to Patriot under the Patriot Kickback Agreement and received and accepted kickbacks from Patriot in the form of borrower leads data and lists.

36.     From September, 2011 through April, 2015, Philip Caruso was employed as a Wells Fargo HMC in a Wells Fargo branch in Somerville, New Jersey. Caruso was required by Wells Fargo corporate management to participate in the Patriot Kickback Agreement as a condition of his continued employment with Wells Fargo. Caruso in fact assigned and referred loans to Patriot under the Patriot Kickback Agreement and received and accepted kickbacks from Patriot in the form of borrower leads data and lists.

37.     From October, 2005 through April, 2015, Jeffrey Nussbaum was employed as a Wells Fargo HMC in a Wells Fargo branch in Red Bank, New Jersey. Nussbaum was required by Wells Fargo corporate management to participate in the kickback agreement with Patriot as a condition of his continued employment with Wells Fargo.  Nussbaum in fact assigned and referred loans to Patriot under the Patriot Kickback Agreement and received and accepted kickbacks from Patriot in the form of borrower leads data and lists.

688694.1

38.     From November, 2007 through June, 2015, Charles McKenna was employed as a Wells Fargo HMC and branch manager in a Wells Fargo branch in Bensalem, Pennsylvania. McKenna was required by Wells Fargo corporate management to participate in the Patriot Kickback Agreement as a condition of his continued employment with Wells Fargo. McKenna in fact referred loans to Patriot under the Patriot Kickback Agreement and received and accepted kickbacks from Patriot in the form of borrower leads data and lists.

39.     Based upon Patriot's and Wells Fargo's continuing pattern of practice, in addition to Crowe, Bellak, Cramer, Cibotti, Dally, Fuhrmesiter, Caruso, Nussbaum, and McKenna, other branch managers, HMCs, and other employees and/or agents of Wells Fargo were required to and did participate in the Patriot Kickback Agreement, in fact assigned and referred Wells Fargo loans to Patriot for title and settlement services under the Patriot Kickback Agreement, and received and accepted borrower leads data and lists, and, upon information and belief, other things of value.

40.     Wells Fargo's branch managers, HMCs and other employees and/or agents did not provide any title or settlement services associated with the kickbacks Wells Fargo received and accepted pursuant to the Patriot Kickback Agreement.  Patriot paid Wells Fargo kickbacks solely for the assignment and referral of Wells Fargo loans to Patriot.

41.     Borrowers, including Plaintiffs and Class Members, were harmed by the kickback agreement and kickbacks because, as described in ¶¶25-28, they paid $100 (and more) extra for their settlement services than they would have without Defendants' coordinated business relationship under the Patriot Kickback Agreement.

42.     Borrowers, including Plaintiffs and Class Members, were also harmed by the kickbacks and Patriot Kickback Agreement because they purchased a loan and title and

688694.1

settlement services subject to a kickback, and were thereby deprived of the kickback-free settlement services that was Congress' primary goal of 12 U.S.C. § 2607(a).

43.    Borrowers, including Plaintiffs and Class Members, were harmed by the Patriot Kickback Agreement because Wells Fargo and Patriot deprived borrowers of information about the title and settlement services related to their residential mortgage loan, including the cost of those settlement services and special and/or extra charges and discretionary fees affecting those costs, divesting borrowers of the very information Congress intended RESPA to provide borrowers. 12 U.S.C. § 2601(a), (b)(1).

44.    Borrowers, including Plaintiffs and Class Members, were also harmed by the Patriot Kickback Agreement because it stripped borrowers of the benefits of fair and impartial competition among independent settlement service providers, including increased information available to borrowers regarding the availability and cost of settlement services, avoidance of special and/or extra charges and discretionary fees in the cost of settlement services, and increases in quality and service in the processing and closing of loans.

45.    Borrowers, including Plaintiffs and Class Members, were also harmed by the Patriot Kickback Agreement because, by requiring Wells Fargo HMCs to participate in the Patriot Kickback Agreement, Wells Fargo management created a insurmountable conflict of interest between its borrowers and HMCs, depriving Wells Fargo borrowers, including Plaintiffs and Class Members, of their choice of title and settlement service providers, as well as their brokers' impartial evaluation of title and settlement service providers.

## FACTS FOR INDIVIDUAL CLASS REPRESENTATIVES

46.    In or about June, 2014, Plaintiff Anna Conover and her husband Marshall Conover, deceased, obtained a federally-related residential mortgage, brokered through Wells

688694.1

Fargo HMC Kathryn Griffin, in relation to the refinancing of their residential real property at 238 Main Avenue, Milmay, New Jersey.

47.    Wells Fargo HMC Griffin assigned and referred the Conover loan to Patriot for title and settlement services pursuant to the Patriot Kickback Agreement.

48.    Patriot charged the Conovers the maximum amount for settlement services, including special and/or extra charges and discretionary fees related to Conover's Wells Fargo loan.

49.    The Conovers would have chosen to minimize the settlement service costs associated with their refinance and avoid paying special and/or extra charges or discretionary fees.

50.    For example, Patriot charged the Conovers special and/or extra charges in the amount of $75 associated with holding the settlement of their loan "after hours out of office." But the Conovers were available for the entire day for the settlement of their Wells Fargo loan, and would have chosen to have the closing at Patriot's office and/or during normal business hours to minimize the fee associated with the settlement and reduce their settlement costs by up to $75.

51.    In addition, Patriot charged the Conovers $30 for overnight delivery services the Conovers did not request and should not have been charged.

52.    Neither Wells Fargo nor Patriot disclosed to the Conovers that they were charged the maximum amount for settlement services, including special and/or extra charges and discretionary fees, or ways in which to avoid the higher settlement service costs related to their refinance and/or avoid special and/or extra charges and discretionary fees charged by Patriot.

688694.1

Neither Wells Fargo nor Patriot provided the Conovers with an itemized list of the special and/or extra charges or discretionary fees the Conovers were charged.

53.    The Conover loan closed on or about June 16, 2014.  The Conovers' HUD-1 reflects that Patriot charged the Conovers for title and settlement services and Patriot disbursed those charges to itself from the proceeds of the Conover's Wells Fargo loan. *See* **Exhibit 1,** Conover HUD-1.

54.    Wells Fargo, by and through its employee Griffin, assigned and referred the Conover loan to Patriot for title and settlement services pursuant to the Patriot Kickback Agreement and as a quid pro quo for Wells Fargo receiving borrower leads data and lists, and, upon information and belief, other things of value, from Patriot.

55.    As a direct and proximate cause of the actions of Wells Fargo and Patriot, Plaintiff Anna Conover was harmed because: (i) she paid higher and additional costs for settlement services associated with her Wells Fargo loan than she would have without the kickbacks or the Defendants' coordinated business relationship under the Patriot Kickback Agreement (ii) was deprived of kickback free settlement services, and (iii) suffered the other harms described in ¶¶42-46 above.

56.    In or about June, 2014, Plaintiffs Parrish and Jacqueline Sheridan obtained a federally-related residential mortgage, brokered through Wells Fargo by HMC Jeffrey Nussbaum, in relation to the refinancing of their residential real property at 213 Fairway Lane, Neptune, New Jersey.

57.    Wells Fargo HMC Nussbaum assigned and referred the Sheridan's Wells Fargo loan to Patriot for title and settlement services pursuant to the Patriot Kickback Agreement.

13

58.     Patriot charged the Sheridans the maximum amount for settlement services, including special and/or extra charges and discretionary fees.

59.     The Sheridans would have chosen to minimize the settlement service costs associated with their refinance and avoid paying special and/or extra charges or discretionary fees.

60.     For example, Patriot charged the Sheridans special and/or extra charges in the amount of $75 associated with holding the settlement of their loan "after hours out of office." But the Sheridans had taken the day off from work and otherwise cleared their schedules for the entire day for the settlement of their Wells Fargo loan, and would have chosen to have the closing at Patriot's office during normal business hours to minimize the fee associated with the settlement and reduce their settlement costs by $75.

61.     In addition, Patriot charged the Sheridans $30 for overnight delivery services the Sheridans did not request and should not have been charged.

62.     Neither Wells Fargo nor Patriot disclosed to the Sheridans that they were charged the maximum amount for settlement services, including special and/or extra charges and discretionary fees, or ways in which to lower the settlement service costs related to their refinance or avoid special and/or extra charges and discretionary fees.  Neither Wells Fargo nor Patriot provided the Sheridans with an itemized list of the special and/or extra charges, or discretionary fees the Sheridan were charged.

63.     The Sheridan's Wells Fargo loan closed on or about June 25, 2014. The Sheridan's HUD-1 reflects that Patriot charged the Sheridans for title and settlement services related to the Sheridan's Wells Fargo loan and Patriot disbursed those charges to itself out of the proceeds from the Sheridan's Wells Fargo loan.  *See* **Exhibit 2**, Sheridan HUD-1.

688694.1

64.     Wells Fargo, by and through its employee Nussbaum, referred the Sheridans to Patriot for title and settlement services under the Patriot Kickback Agreement as a quid pro quo for receiving borrower leads data and lists, and, upon information and belief, other things of value, from Patriot.

65.     As a direct and proximate cause of the actions of Wells Fargo and Patriot, the Sheridans was harmed because: (i) they paid higher and additional costs for settlement services associated with their Wells Fargo loan than they would have without the kickbacks or the Defendants' coordinated business relationship under the Patriot Kickback Agreement (ii) were deprived of kickback free settlement services, and (iii) suffered the other harms described in ¶¶42-46.

66.     In or about November, 2014, Plaintiffs Bryan and Jacqueline Van Velson obtained a federally-related residential mortgage, brokered through Wells Fargo by HMC Jeffrey Nussbaum, in relation to the refinancing of their residential real property at 4 Park View Drive, Hazlet, New Jersey.

67.     Wells Fargo HMC Nussbaum assigned and referred the Van Velson loan to Patriot for title and settlement services pursuant to the Patriot Kickback Agreement.

68.     Patriot charged the Van Velsons the maximum amount for settlement services for their Wells Fargo loan, including special and/or extra charges and discretionary fees.

69.     The Van Velsons are on a fixed income and would have chosen to minimize the settlement service costs associated with their refinance and avoid paying special and/or extra charges or discretionary fees.

70.     For example, Patriot charged the Van Velsons special and/or extra charges in the amount of $75 associated with holding the settlement of their loan "after hours out of office."

15

But the Van Velsons were available at any time during the entire day of the settlement of their Wells Fargo loan, and would have chosen to have the closing at Patriot's office during normal business hours to minimize the fee associated with the settlement and reduce their settlement costs by $75.

71.     In addition, Patriot charged the Van Velsons $30 for overnight delivery services the Van Velsons did not request and should not have been charged.

72.     Neither Wells Fargo nor Patriot disclosed to the Van Velsons that they were charged the maximum amount for settlement services, including special and/or extra charges and discretionary fees, or ways in which to lower the settlement service costs related to their refinance or avoid special and/or extra charges and discretionary fees.  Neither Wells Fargo nor Patriot provided the Van Velsons with an itemized list of the special and/or extra charges or discretionary fees the Van Velson's were charged.

73.     The Van Velson's Wells Fargo loan closed on or about November 10, 2014. The Van Velson's HUD-1 reflects that that Patriot charged the Van Velsons for title and settlement services related to the Van Velson's Wells Fargo loan and Patriot disbursed those charges to itself out of the proceeds from the Van Velson's Wells Fargo loan.  *See* **Exhibit 3**, Van Velson HUD-1.

74.      Wells Fargo, by and through its employee Nussbaum, assigned and referred the Van Velson's Wells Fargo loan to Patriot for title and settlement services under the Patriot Kickback Agreement as a quid pro quo for receiving borrowers leads data and lists, and, upon information and belief, other things of value, from Patriot.

75.     As a direct and proximate cause of the actions of Wells Fargo and Patriot, the Van Velsons were harmed because: (i) they paid higher and additional costs for settlement services

associated with their Wells Fargo loan than they would have without the kickbacks or the Defendants' coordinated business relationship under the Patriot Kickback Agreement; (ii) were deprived of kickback free settlement services; and (iii) suffered the other harms described in ¶¶42-46.

76.    The Conover, Sheridan and Van Velson transactions and the course of events thereafter exemplify the working of the Patriot Kickback Agreement, and are typical of all Class Members' transactions.

## ALLEGATIONS SUPPORTING EQUITABLE TOLLING

77.    As an essential feature of the kickback agreement, Patriot and Wells Fargo fraudulently concealed from borrowers, including Plaintiffs and Class Members, their coordinated business relationship, the kickback agreement, and the payment, receipt and acceptance of illegal kickbacks associated with any particular Wells Fargo loan.  Concealment was particularly important because, during the time period of the Patriot Kickback Scheme, the MIA and CFPB were investigating Wells Fargo's participation in the Genuine Title Kickback Scheme.

78.    For this reason, and to facilitate and further conceal the kickback agreement, Wells Fargo's HMCs chose the business practice of, at the time of taking a loan application, refusing to disclose to the borrower that Wells Fargo would assign and refer the loan to Patriot for title and settlement services or, in some instances, that title and settlement services were needed to close the loan at all.  Wells Fargo chose this business practice to ensure that it would be able to assign and refer to Patriot the largest number of loans – and receive the corresponding kickbacks – with minimal, if any, interference from borrowers.

688694.1

79.     As a result, few, if any, Wells Fargo borrowers were even aware that Patriot was the title and settlement services company associated with their Wells Fargo loan.

80.     Wells Fargo chose to withhold this information from borrowers for the purpose of concealing from borrowers, and did so conceal, the Defendants' coordinated business relationship under the Patriot Kickback Agreement and the kickbacks Wells Fargo received from Patriot.

81.     As to the Conover loan, at the time of taking the refinance application, Wells Fargo HMC Griffin chose to not inform the Conovers that their Wells Fargo loan would be assigned and referred to Patriot for title and settlement services and did not disclose Wells Fargo's kickback agreement with Patriot. Wells Fargo HMC Griffin withheld this information back from the Conovers for the purpose of concealing, and did so conceal, the Defendants' coordinated business relationship, and to prevent the Conovers from interfering with Wells Fargo assignment and referral of the Conover loan to Patriot under the Patriot Kickback Agreement and the kickback Wells Fargo received from Patriot related to the Conover loan.

82.     As to the Sheridan loan, at the time of taking the refinance application, Wells Fargo HMC Nussbaum did not inform the Sheridans that their Wells Fargo refinance would be assigned and referred to Patriot for title and settlement services and did not disclose Wells Fargo's kickback agreement with Patriot.   Wells Fargo HMC Nussbaum withheld this information from the Sheridans for the purpose of concealing, and did so conceal, the Defendants' coordinated business relationship, and to prevent the Sheridans from interfering with Wells Fargo's assignment and referral of the Conover loan to Patriot under the Patriot Kickback Agreement and the kickback Wells Fargo received from Patriot related to the Sheridan loan. As a result, the Sheridans were not aware that Patriot was the title and settlement services

company providing title and settlement services related to their Wells Fargo loan until they were at the settlement table.

83. As to the Van Velson loan, at the time of taking the refinance application, Wells Fargo HMC Nussbaum did not inform the Vann Velsons that their Wells Fargo refinance would be assigned and referred to Patriot for title and settlement services and did not disclose Wells Fargo's kickback agreement with Patriot. Wells Fargo HMC Nussbaum withheld this information from the Van Velsons for the purpose of concealing, and did so conceal, the Defendants' coordinated business relationship, and to prevent the Van Velsons from interfering with Wells Fargo's assignment and referral of the Van Velson loan to Patriot under the Patriot Kickback Agreement and the kickback Wells Fargo received from Patriot related to the Van Velson loan. As a result, the Van Velsons were not aware that any third party was involved in their Wells Fargo loan or that Patriot was the title and settlement services company providing title and settlement services related to their loan.

84. Plaintiffs believe, and therefore aver, that Patriot and Wells Fargo chose borrower leads data and lists as the currency of the kickbacks under the belief that these things of value were not required to be reported on a borrower's Good Faith Estimate ("GFE"), HUD-1 or other loan documents and the kickbacks and kickback agreement would thereby be concealed from investigators, regulators, and borrowers, including Plaintiffs and Class Members.

85. For this reason, and to facilitate and conceal the kickback agreement, Patriot and Wells Fargo adopted the business practice of omitting the kickbacks, the Patriot Kickback Agreement and the fact of their coordinated business relationship from borrowers' loan documents, including the GFE and HUD-1.

688694.1

86.     Patriot and Wells Fargo followed this business practice with Plaintiffs, and chose to omit the kickbacks and the fact of Defendants' coordinated business relationship under the Patriot Kickback Agreement from the Conover's, Sheridan's and Van Velson's loan documents, including the GFE and HUD-1. The purpose of these omissions was to conceal the kickbacks and Defendants' coordinated business relationship under the Patriot Kickback Agreement from Plaintiffs, and it was so concealed from Plaintiffs.

87.     Plaintiffs believe, and therefore aver, that Patriot paid, and Wells Fargo chose borrower leads data and lists as the currency of the kickbacks under the belief that these things of value could easily be paid, received and accepted without detection and the kickbacks and the kickback agreement would thereby be concealed from investigators, regulators, and borrowers.

88.     These fraudulent concealments were caused solely by the actions and conduct of Patriot and Wells Fargo and were outside Plaintiffs' control.

89.     Plaintiffs exercised reasonable diligence before, during and after the closing of their respective Wells Fargo loans.

90.     In advance of the closing of their loans, Plaintiffs each and all received loan documents prepared by Patriot and Wells Fargo and reviewed those loan documents.

91.     Upon information and belief, based on Patriot's and Wells Fargo's continuing pattern of practice, Wells Fargo chose to omit from Plaintiffs' pre-closing loan documents any description or statement of the Defendants' coordinated business relationship under the Patriot Kickback Agreement, or the fact that Wells Fargo would be paid any thing of value for the assignment and referral of the Plaintiffs' loans to Patriot.

92.     As was reasonable under the circumstances, Plaintiffs believed these documents and the representations made therein. A reasonable borrower would have no reason to believe,

and Plaintiffs did not believe, that a coordinated business relationship existed between Patriot and Wells Fargo. A reasonable borrower would have no reason to believe, and Plaintiffs did not believe there would be any payment or exchange of a thing of value between Patriot and Wells Fargo related to Plaintiffs' loans.

93.     Plaintiffs acted diligently during the closing or settlement of Plaintiffs' Wells Fargo loans. As a condition of the funding their loans, Wells Fargo required Plaintiffs to participate in a settlement, and Plaintiffs each attended and participated in the required settlement.

94.     Patriot, and or its employees and/or agents, conducted the settlement of Plaintiffs' loans.

95.     At each settlement, Patriot provided Plaintiffs with multiple loan documents, including a HUD-1.  Plaintiffs reviewed and signed all of the documents Patriot provided at the closing, including the HUD-1 statement.  Plaintiffs also asked questions and received answers related to questions generated by Plaintiffs' review of the closing documents.

96.     Upon information and belief, based on Wells Fargo's and Patriot's continuing pattern of practice, the documents Plaintiffs received at closing did not contain a description or statement of the coordinated relationship between Patriot and Wells Fargo under the Patriot Kickback Agreement, or that any thing of value would be paid by Patriot to Wells Fargo related to Plaintiffs' loans.

97.     As was reasonable under the circumstances, Plaintiffs believed these documents and the representations made therein. A reasonable borrower would have no reason to believe, and Plaintiffs did not believe that a coordinated business relationship existed between Patriot and Wells Fargo. A reasonable borrower would not believe, and Plaintiffs did not believe, there

21

would be any payment or exchange of a thing of value between Patriot and Wells Fargo related to Plaintiffs' loans.

98.    Plaintiffs acted diligently after their closings. On or about April 28, 2017, Plaintiffs received a letter from undersigned counsel describing the Patriot Kickback Agreement and setting forth facts supporting a conclusion that Patriot paid kickbacks related to Plaintiffs' loans.  Upon receiving a letter from undersigned counsel, Plaintiffs' first indication of any potential wrongful, illegal, and/or actionable conduct by anyone, Plaintiffs contacted and retained counsel and filed this Complaint within one year of becoming aware of facts giving rise to their causes of action.

99.    As a result of Patriot's and Wells Fargo's fraudulent concealment of their coordinated business relationship, and the payment, receipt and acceptance of kickbacks related to the Plaintiffs' loans, and Plaintiffs' diligence before, during and after the closing of their loans, which was reasonable under the circumstances, the statute of limitations was tolled beginning on the date of each Plaintiff's loan settlement and continuing until Plaintiff's learning of facts giving rise to his or her causes of action, on or about April 28, 2017.

100.    Plaintiffs believe and therefore aver, that the fraudulent concealments described herein were an integral component of the kickback agreement, and typical of all Class Members' transactions such that all Class Members are entitled to equitable tolling of the applicable limitations period.

## **CLASS ACTION ALLEGATIONS**

101.    The allegations in the above stated paragraphs are incorporated by reference as if fully restated herein.

688694.1

102.    Plaintiffs bring this action on behalf of themselves and all other similarly situated individuals pursuant to Fed. R. Civ. P. 23, and the alleged Patriot Class is defined as follows:

> All individuals who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) brokered or originated by Wells Fargo Bank N.A. and secured by real property in New Jersey for which Patriot Land Transfer, LLC (also d/b/a Patriot Land Transfer of NJ, LLC) provided a settlement service, as identified in Section 1100 on the HUD-1, between January 1, 2013, and April 13, 2015. Exempted from this class is any person who, during the period of January 1, 2013 through April 13, 2015, was an employee, officer, member and/or agent of Patriot Land Transfer, LLC, Wells Fargo N.A. and/or any judicial officer who handles this case, and the immediate family members of such judicial officer(s).

103.    There are questions of law and fact common to the claims of each and all members of the Class.  These common questions include, but are not limited to:

a.    Whether Wells Fargo and its employees and/or agents received illegal kickbacks from Patriot for the assignment and referral of business to Patriot;

b.    Whether Wells Fargo and its employees and/or agents' receipt and acceptance of borrower leads data and lists and, upon information and belief, other things of value violated RESPA;

c.    Whether Plaintiffs and Class Members were forced to pay more for said settlement services;

d.    Whether Wells Fargo and Patriot actively concealed the kickbacks and kickback agreement to avoid detection by Plaintiffs and Class Members;

e.    Whether Plaintiffs and the Class are entitled to treble damages under RESPA;

f.    Whether Plaintiffs and the Class are entitled to attorneys' fees and expenses under RESPA;

688694.1

g.   Whether Wells Fargo failed to disclose and concealed from Plaintiffs and Class Members that Wells Fargo, and its branch managers, HMCs and other employees and/or agents, were participating with Patriot in the Patriot Kickback Agreement and failed to disclose and concealed, among other things, their coordinated business arrangements and/or relationships; and

h.   Whether despite exercising reasonable due diligence, Plaintiffs and Class Members did not and could not have learned of the illegal kickbacks and the Patriot Kickback Agreement until contacted by counsel.

104.   These common issues of law and fact, and the common statutory measure of damages, predominate over any question affecting only individual Class Members.

105.   Plaintiffs' claims are typical of the claims or defenses of the respective Class Members, and are subject to the same statutory measure of damages set forth in 12 U.S.C. § 2607(d)(2).

106.   Plaintiffs will fairly and adequately protect the interests of the Class. The interests of the named Plaintiffs and all other members of the Class are identical.

107.   Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings and will adequately represent the Class' interests.

108.   The Class consists, upon information and belief, of over one hundred borrowers, and thus are so numerous that joinder of all members is impracticable.

109.   Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Wells Fargo.

688694.1

110.     This action entails questions of law and fact common to Class Members that predominate over any questions affecting only individual Plaintiffs, and, therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

111.     Other than those who have been contacted by counsel, Class Members are unaware of their rights to prosecute a claim against Defendants.

112.     No member of the Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

## COUNT I
## Violation of the Real Estate Settlement Procedures Act (RESPA),
## 12 U.S.C. § 2607(a)

113.     Plaintiffs incorporate the above stated paragraphs as if restated herein.

114.     All transactions at issue in the instant complaint are incident to or part of real estate settlement services involving federally related mortgage loans and thereby are subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

115.     At all relevant times, Patriot was subject to the provisions of RESPA, 12 U.S.C. § 2601, *et. seq.*

116.     As a lender and/or broker and/or servicer of federally related mortgage loans, Wells Fargo, and its branch managers, HMCs and other employees and agents involved in the origination and closing of residential mortgage loans, are subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

117.     Patriot had an agreement with Wells Fargo to pay kickbacks and/or things of value in exchange for referrals of federally related loans to Patriot for title and settlement services in violation of RESPA, 12. U.S.C. § 2607(a).

118.    Wells Fargo in fact assigned federally related loans to Patriot and directly and by and through its branch managers, HMCs, and other employees and/or agents, received and accepted things of value for referrals in violation of RESPA, 12 U.S.C. § 2607(a).

119.    Patriot in fact paid Wells Fargo, and its branch managers and HMCs, kickbacks and/or things of value in exchange for referrals of federally related loans to Patriot, in violation of RESPA, 12. U.S.C. § 2607(a).

120.    All loans referred by Wells Fargo to Patriot the as part of Patriot Kickback Agreement were secured by first or subordinate liens on residential real property and were made in whole or in part by Wells Fargo and/or its affiliates, whose deposits or accounts are insured by the Federal Government and/or who are regulated by an agency of the Federal Government.

121.    The payment and/or arranging of payment of kickbacks to Wells Fargo, its branch managers, HMCs and other employees and/or agents, by Patriot and the corresponding receipt thereof constitute a violation of § 8(a) of RESPA, which prohibits the payment of referral fees or kickbacks pursuant to an agreement in connection with the origination or brokering of federally related mortgage loans.

122.    As a direct and proximate cause of Patriot's and Wells Fargo's actions, Plaintiffs and Class Members paid higher and additional costs for settlement services and suffered the other harms described herein.

WHEREFORE:

   a.    Plaintiffs respectfully demand this Court to certify this class action pursuant to Federal Rule of Civil Procedure 23 and set this matter for trial; and

b.      Demand judgment for Plaintiffs and Class Members against Patriot and Wells

Fargo, jointly and severally, and award Plaintiffs and Class Members an amount

equal to:

1.      Damages for settlement services charged by Patriot, including, but not limited to,

title insurance premiums, in an amount equal to three times the amount of any charge paid for

such settlement services, pursuant to 12 U.S.C. § 2607(d)(2);

2.      Reasonable attorneys' fees, interest and costs under 12 U.S.C. § 2607(d)(5); and

3.      Such other and further relief as this Court deems proper.


**LITE DEPALMA GREENBERG LLC**

Dated: May 7, 2018                      */s/ Bruce D. Greenberg*
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 877-3820
Facsimile:  (973) 623-0858
bgreenberg@litedepalma.com

*Counsel for Plaintiffs and Class Members*

**JOSEPH, GREENWALD & LAAKE**
Timothy F. Maloney, Esq.
Veronica B. Nannis, Esq.
Megan A. Benevento, Esq.
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
Telephone: (301) 220-2200
Facsimile:  (301) 220-1214
tmaloney@jgllaw.com
vnannis@jgllaw.com
mbenevento@jgllaw.com

*Co-Counsel for Plaintiffs, Pro Hac Vice*

688694.1

**SMITH, GILDEA & SCHMIDT, LLC**
Michael Paul Smith, Esq.
Melissa L. English, Esq.
Sarah A. Zadrozny, Esq.
600 Washington Avenue, Suite 200
Towson, MD 21202
Telephone: (410) 821-0070
Facsimile:  (410) 821-0071
Email: mpsmith@sgs-law.com
menglish@sgs-law.com
szadrozny@sgs-law.com
*(Pro Hac Vice admission to sought)*

*Counsel for Plaintiffs, Pro Hac Vice*

688694.1

## **PRAYER FOR JURY TRIAL**

Plaintiffs and Class Members hereby request a trial by jury on the foregoing Class Action

Complaint.

**LITE DEPALMA GREENBERG LLC**

_/s/ Bruce D. Greenberg_

Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 877-3820
Facsimile:  (973) 623-0858
bgreenberg@litedepalma.com

*Counsel for Plaintiffs and Class Members*

**JOSEPH, GREENWALD & LAAKE**
Timothy F. Maloney, Esq.
Veronica B. Nannis, Esq.
Megan A. Benevento, Esq.
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
Telephone: (301) 220-2200
Facsimile:  (301) 220-1214
tmaloney@jgllaw.com
vnannis@jgllaw.com
mbenevento@jgllaw.com

*Co-Counsel for Plaintiffs, Pro Hac Vice*

**SMITH, GILDEA & SCHMIDT, LLC**
Michael Paul Smith, Esq.
Melissa L. English, Esq.
Sarah A. Zadrozny, Esq.
600 Washington Avenue, Suite 200
Towson, MD 21202
Telephone: (410) 821-0070
Facsimile:  (410) 821-0071
Email: mpsmith@sgs-law.com
menglish@sgs-law.com
szadrozny@sgs-law.com

*Counsel for Plaintiffs, Pro Hac Vice*

Dated: May 7, 2018

688694.1